POMMERENING v. JENTGEN.

1. BROKERS—COMMISSIONS—DIRECTED VERDICT.
   In an action by brokers for commissions on the sale of real estate, where both parties asked for a directed verdict, evidence *held*, sufficient to justify the direction of a verdict for plaintiffs.[1]

2. SAME—PLEADING—VARIANCE.
   Where the testimony clearly shows that all the parties knew that the buyer of the land was buying as agent for a hospital, there is no variance between the pleadings which allege a sale to the hospital and the proofs which show a sale to the agent.[2]

Error to Washtenaw; Sample (George W.), J. Submitted October 13, 1925. (Docket No. 61.) Decided December 22, 1925.

Assumpsit by Alvin H. Pommerening and Max Blaess, copartners as Pommerening & Blaess, against Charles J. Jentgen for commissions on the sale of real estate. Judgment for plaintiffs on a directed verdict. Defendant brings error. Affirmed.

*Benedict H. Lee* and *Frank B. DeVine,* for appellant.

*Cavanaugh & Burke* and *J. F. Fahrner,* for appellees.

MOORE, J. The plaintiffs sued the defendant to recover for commissions claimed to have been earned because of the sale of real estate owned by the defendant. The claim was contested, and at the close of the testimony on the part of the plaintiffs the de-

[1]Brokers, 9 C. J. §§ 127, 129; [2]Id., 9 C. J. § 114.

fendant moved for a directed verdict in his favor. This motion was overruled. After all the testimony was put in both parties moved for a directed verdict. The trial judge directed a verdict in favor of the plaintiffs in the sum of $1,327.05. The case is brought into this court by writ of error.

As the defendant did not accompany his motion for a directed verdict with the further request that, in case his motion was overruled, questions of fact should be submitted to the jury, we should first examine the record to see if there is any testimony tending to support the directed verdict. *Barschow* v. *Railway Co.*, 147 Mich. 226; *Clark* v. *North American Union*, 179 Mich. 130; *West* v. *Newton*, 229 Mich. 68.

The defendant signed and delivered to the plaintiffs a paper, the material parts of which read as follows:

"POMMERENING & BLAESS,
"Ann Arbor, Mich., March 11th, 1924.
"In consideration of valuable services performed and to be performed by you, I, the undersigned, hereby give to you for a term of six months the sale of the following described property, to wit: * * * upon the following terms: viz.: $33,000.00 cash, or any other terms agreed to after the validity of this contract and in case you find a buyer ready and willing to consummate a deal on the foregoing terms, or in case of sale of said above described property during the life of this contract, I agree to pay you $1,300.00 as a commission all over the sum of $31,700.00 received therefor, which said commission and excess over agreed price is to be retained by you out of the first money paid on said property. * * * This agreement shall be in full force for the term above specified, also to continue until I give you 30 days' written notice of withdrawal."

The plaintiffs at once made efforts to sell the land, and among prospective buyers were Father Bourke, acting for the St. Joseph's Mercy Hospital, and a man by the name of Wagner. After the plaintiffs had

agreed, as they supposed, upon a sale to Mr. Wagner, Mr. Pommerening had an interview with Father Bourke. We quote some of Mr. Pommerening's testimony:

"Father Bourke called up regarding an advertisement we had   *   *   *   and after I had shown him two or three places I came to the conclusion I had only one place on my list that would satisfy him and that was Dr. Jentgen's farm.   I took him to this farm, introduced him to Frank Jentgen and Mrs. Jentgen and the father of Dr. Jentgen, and asked permission to show the farm.   We went all over the farm and buildings. He seemed very much interested and he told me then that the proposition appealed to him and after proper arrangements or negotiations had been made he would probably submit a proposition.   He also asked permission to take the sisters to the farm and he did. He took them over the same evening.   *   *   *   I told him I was negotiating with Mr. Wagner for the sale of this farm and, to be fair with all my clients, I wanted to specify every condition covering that negotiation and I told him I had then a contract all ready signed by Mr. Wagner and had a $500-check in my pocket to bind the sale for the purchase, but the contract required the doctor taking a $13,000-mortgage on this mill and I didn't think from the way the doctor talked he would consider that $13,000-mortgage, and I advised him if he was interested in that property to get action as soon as possible because it was the party who would get the money first that would be the buyer for the property.

"The doctor came to my office the day following and said to me: 'I understand you showed the farm to Father Bourke and the sisters from the hospital?'   I told him I had and he asked me to keep in touch with them which I agreed to do.   That was the following day.   I told the doctor I had shown the farm to Father Bourke and he told me to keep in touch with them and I instructed him as Father Bourke told me, he would have to negotiate with his principal and as soon as anything definite came through he would call me."

Father Bourke was a witness, and we quote some of his testimony:

"I learned from Mr. Pommerening first of all that the property described in the advertisement would not be suitable for our purpose. He told me that and showed me the property I had in mind. I agreed with him. * * * Finally he said that he did have the agency for the sale of a piece of property that was formerly owned by Fred Vandeveer. * * * From his description I was anxious to see the place, because I felt it about fitted the description of the piece I had in mind. We drove to the place where Mr. Pommerening introduced me to the older Mr. Jentgen and the younger Mr. Jentgen and his wife. I looked over the place with Mr. Pommerening. I looked over all the buildings, decided it was ideal for our purpose and came away. Well, as we drove along I told Mr. Pommerening I wanted to report this thing to the corporation. That while I was satisfied, I wanted other parties to be satisfied too, and then as we drove along he mentioned this Wagner deal to me. He said he had another negotiation under way for the sale of the property and that there was some difficulty in that case about the individual procuring the money. I didn't know the name was Wagner, Mr. Cavanaugh, he mentioned some name and I later found out the name was Wagner. He said Mr. Wagner was having difficulty with the finances but he said this: 'If Mr. Wagner beats you to this, he is going to get the place; if on the other hand, you have the money in time to beat him to it, it is agreeable to me, too.' Because he said we were both clients and he wasn't going to play any favorites in the thing. That is substantially what he said.

"*Q.* After that did you see Dr. Jentgen, the defendant here?

"*A.* Some time after. Before I left Mr. Pommerening I said to him that he would hear from me later, just when, I didn't know. * * * That evening it happened that Mother Ursula of Dubuque, Iowa, came into the city. She is the president of the corporation. I talked to Mother Ursula, also to Sister Carmalita, who is superintendent of the local branch of the hospital. I told them what I knew of the place

and they expressed the wish to go and see it and I had our driver take us out there that same evening, July 9th, if that is the date.    On that occasion I introduced Mother Ursula and Sister Carmalita to Mrs. Jentgen.    I don't recall anybody else was there.    Perhaps there was but I don't recall, and she took us all through the house and we looked at the buildings and around the farm and we finally came away.    Mother Ursula then said she was going back to Dubuque and she would communicate with me later.    *    *    *

"A man claiming to be the representative of the doctor, if I don't mistake, his name was Ronan.    *    *    *    This man came to see me and claimed to be representing the doctor—his interest.    He told me he was a representative of the doctor and said he understood the hospital wanted to buy the property. That was several days after I had been shown the property by Pommerening.    I mentioned at that time to him I had been dealing with Mr. Pommerening for the place and he said Mr. Pommerening had withdrawn from the entire transaction.    Subsequently I believe he called again.    *    *    *    I offered the doctor $25,000 for the property.    He was very much offended because it was such an outrageously low figure. He said he wanted $35,000 for it, which was the same figure Mr. Pommerening had asked.    After some discussion the matter was left practically in that way and the following day I went into Detroit.    That was Monday, August 4th, and called upon Doctor Jentgen at his office in the Basso building.    We talked the matter over again and I bought the property at that time, taking a memoranda of agreement in my own name which I have here, signed by the doctor.

"Q. For how much?

"A. $35,000.    *    *    *

"The Sunday Doctor Jentgen came to see me I mentioned Mr. Pommerening to him and he told me then that Mr. Pommerening had withdrawn from the transaction and I made this statement to him; I said 'I will bet you Mr. Pommerening will be suing you for a commission on this and I want you to know where I stand.    I would have to state Mr. Pommerening was the one that first brought me to that property.'    I repeated that later on to the doctor.    Mr. Pommerening was the first man that took me to the property.

I never recall having seen it before he took me to it. The first impression that I got in relation to that property came from Mr. Pommerening and on the representation he made and my inspection it was bought eventually. I was not influenced in any way by the Jentgens to buy this property. I had my mind made up before I saw the doctor or any of his family. Through Mr. Pommerening. That is the only source I got any information about the property."

On August 4, 1924, Father Bourke obtained from defendant a written memorandum for a purchase at $35,000, with the following:

"It is understood that if the entire balance be paid in cash January 1, 1925, then the consideration will be $32,500 instead of $35,000."

At the time of the trial $18,000 of the purchase price had been paid.

It is the claim of the defendant that plaintiffs had thrown up the contract as is evidenced by the testimony of the father of the defendant, and by a letter of date July 21, 1924, in which the following appears:

"Dear Doctor Jentgen: It seems that the transaction we have under way will never be made. The reason I believe is because we have nothing of a definite nature in writing relating to this particular deal. * * *

"Either sign the agreement and return same immediately so that I can go ahead unmolested and close this deal or forget me as a person who might have a buyer for your farm and get one of the many other good farm dealers we have in this community.

"Also kindly remember that the undersigned is the financier of the, this particular sale and holds all the strings to the making of same.

"Yours truly,
"POMMERENING & BLAESS.
"By ALVIN H. POMMERENING.

"P. S. The Wagners are leaving for a ten-day vacation Thursday of this week and this agreement must reach me not later than Wednesday, July 23d, if you care to sell."

The defendant answered the letter the next day in which the following occurs:

"Your agreement you sent me to sign, does not meet with my approval. You are again demanding some concessions, so I guess the deal is off, but if you do not care to lose your commission, after all the work you have done, I will agree to pay for an abstract for the entire place on the original terms. Now, Mr. Pommerening, you can do just as you like, it makes little difference to me. I will get you the abstract on the basis of last offer.

"I hesitated in writing you this letter after the tone of your letter, but I want to be fair and do not like to see you do all this work for nothing."

The correspondence indicates very clearly that both parties understood it related to the pending Wagner deal.

Complaint is also made of the admission of oral testimony when it is said the writings were the better evidence. As the case was finally decided by the trial judge we think it unnecessary to discuss this branch of the case.

It is claimed there is a variance between the pleadings which allege the sale was made to the St. Joseph's Mercy Hospital, and the proofs which show a sale to Father Bourke. The testimony is very clear that all parties knew Father Bourke was acting for the St. Joseph's Mercy Hospital. We quote from the testimony of defendant:

"At that time I went into the fact that the house would make a very nice convalescent home and I went into the argument that one of the former owners, Mrs. Vandeveer, had planned the house for that reason and I told him to take this argument to Father Bourke and I would be sure he would be interested because I could see the possibility, because I was a physician. I didn't think he could see it because he wasn't in that line of business. That is why I gave that argument to go to Father Bourke."

The testimony disclosed by the cross-examination of the defendant shows that well within the time limit of the written agreement a sale was made to Father Bourke, whose testimony we have already quoted, in part, for a sum of money in excess of that mentioned in the written agreement. There is ample testimony to justify the directed verdict. *Ellsmore* v. *Gamble*, 62 Mich. 543; *Heaton* v. *Edwards*, 90 Mich. 500; *Ranson* v. *Weston*, 110 Mich. 240; *West* v. *Newton*, 229 Mich. 68.

Judgment is affirmed, with costs to the appellees.

McDONALD, C. J., and CLARK, BIRD, SHARPE, STEERE, FELLOWS, and WIEST, JJ., concurred.